**RAPP COLLINS WORLDWIDE, INC., Appellant,**

v.

**Robert R. MOHR, Appellee.**

**No. 05–96–00627–CV.**

Court of Appeals of Texas, Dallas.

Aug. 31, 1998.

Rehearing Overruled Oct. 12, 1998.

Mark M. Donheiser, Munsch, Hardt, Kopf, Harr & Dinan, P.C., Dallas, Karen Brown Willcutts, Michael Jung, Strasburger & Price, L.L.P., Dallas, Appellant.

Daniel J. Sheehan, Jr., Thomas Sheehan & Culp, L.L.P., Dallas, for Appellee.

Before KINKEADE, WHITTINGTON and JAMES, JJ.

## OPINION

KINKEADE, Justice.

Rapp Collins Worldwide, Inc. (Rapp Collins) appeals a judgment awarding Robert R. Mohr $150,000 and costs following a bench trial. In seventeen points of error, Rapp Collins attacks the sufficiency of the evidence to support some of the trial court's findings of facts and conclusions of law. In a single cross-point, Mohr contends the trial court erred in failing to award his attorney's fees because attorney's fees are recoverable under Texas law and Texas law should apply. We conclude the evidence supports the relevant trial court findings and the trial court did not err in entering the conclusions of law that support the judgment. We also conclude the trial court correctly determined New York law should apply to the issue of attorney's fees, and New York law does not allow the recovery of attorney's fees in this case. Accordingly, we affirm the trial court's judgment.

## Factual Background

From 1981 to August 31, 1992, Robert Mohr was president and CEO of Rapp Collins, a full-service direct marketing advertising agency with offices in Irving, Texas. Rapp Collins is wholly owned by Omnicom Group, Inc., a New York company, and is supervised by Diversified Agency Services (DAS), a division of Omnicom. During the relevant time periods, John Wren was president of DAS.

In May of 1992, Mohr informed Wren that he wished to resign as president and CEO of Rapp Collins. Mohr's employment contract with the company required that he give a twelve-month notice before terminating his employment; however, Mohr desired to be released from his twelve-month obligation. Mohr expressed this desire to Wren, and the two men negotiated a Termination Agreement (the Agreement), whereby Rapp Collins would release Mohr from his obligation provided Mohr remained available to act as a consultant for Rapp Collins through the twelve-month period. The Agreement specifically listed several tasks that Mohr might be called on to perform, including renegotiating a contract with Hyatt Hotels, negotiating another significant contract, and being available to Rapp Collins two days a month for consulting duties. The Agreement did not contain a non-compete clause; it merely stated that Mohr could continue to work in the industry as long as his work did not interfere with his consulting duties and that he observe the obligations contained in a prior employment agreement that prevented him from soliciting Rapp Collins's clients or disclosing confidential information.

The Agreement provided that Rapp Collins would pay Mohr his annual salary at the rate of $325,000 for the term of the Agreement. It also contained a discretionary bonus provision providing that if Mohr completed his "consulting duties in an acceptable manner to the Company (as determined in the sole discretion of the President of DAS)," the company would pay him a bonus of $150,000. The Agreement, revocable by either party within seven days, was signed on August 31, 1992. On September 8, 1992, Mohr advised Rapp Collins that he had purchased a small direct marketing/advertising company called DMDA and had become DMDA's chief executive officer. Several days later, Wren instructed Rapp Collins's officers not to use Mohr for any consulting tasks. Edward McNally, chief operating officer and chief financial officer at Rapp Collins, advised Mohr that because he was CEO for a competitor, Rapp Collins did not believe it could use him to perform the tasks set out in the Agreement and instructed Mohr to cease working on the specific consulting assignments outlined in the Agreement. Although Mohr subsequently requested to be assigned tasks he could do for Rapp Collins in order to earn the $150,000 bonus, Rapp Collins did not utilize his services under the Agreement.

At the end of the consulting term, Wren denied Mohr the $150,000 discretionary bonus, stating that he was not satisfied with Mohr's performance as a consultant.

Mohr sued to recover the $150,000 under the Agreement. Following a five-day trial to the bench on the sole issue of whether Rapp Collins owed Mohr $150,000, the trial court entered judgment for Mohr granting him the $150,000. The court also denied Mohr's request for attorney's fees. The trial court entered findings of fact and conclusions of law.

In this appeal, Rapp Collins challenges some, but not all, of the trial court's findings of fact and conclusions of law. Rapp Collins raises both legal and factual sufficiency challenges to these findings.

### Standard of Review

Findings of fact entered in a case tried to a court are of the same force and dignity as a jury's verdict upon special issues. *Gregory v. Sunbelt Sav., F.S.B.*, 835 S.W.2d 155, 158 (Tex.App.—Dallas 1992, writ denied). We apply the same standards in reviewing the legal and factual sufficiency of the evidence supporting the trial court's fact findings as we do when reviewing the legal and factual sufficiency of the evidence supporting a jury's answer to a special issue. *Zieben v. Platt*, 786 S.W.2d 797, 799 (Tex.App.—Houston [14th Dist.] 1990, no writ). We do not substitute our judgment for that of the fact finder, even if we would have reached a different conclusion when reviewing the evidence. *FDIC v. F & A Equip. Leasing*, 854 S.W.2d 681, 684 (Tex.App.—Dallas 1993, no writ).

In addressing a legal sufficiency challenge, we view the evidence in a light most favorable to the finding, consider only the evidence and inferences that support the finding, and disregard all evidence and inferences to the contrary. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987). We uphold the finding if more than a scintilla of evidence exists to support it. *Id.* In reviewing a factual sufficiency challenge, we examine all of the evidence and set aside a finding only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). In the absence of a statement of facts, unchallenged findings of facts are conclusive on appeal; if a statement of facts is filed, however, unchallenged findings of fact are binding on the appellate court unless the contrary is established as a matter of law, or if there is no evidence to support the finding. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696–97 (Tex.1986).

We do not review a trial court's conclusions of law for factual sufficiency. *Sears, Roebuck & Co. v. Nichols*, 819 S.W.2d 900, 903 (Tex.App.—Houston [14th Dist.] 1991, writ denied). When reviewing the trial court's legal conclusions, we evaluate them independently, determining whether the trial court correctly drew the legal conclusions from the facts. *Dallas Morning News v. Board of Trustees*, 861 S.W.2d 532, 536 (Tex. App.—Dallas 1993, writ denied). Conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Waggoner v. Morrow*, 932 S.W.2d 627, 631 (Tex.App.—Houston [14th Dist.] 1996, no writ). Incorrect conclusions of law will not require reversal if the controlling findings of fact will support a correct legal theory. *Id.*

### Fraudulent Inducement

In points of error one and eight through ten, Rapp Collins contends the trial court erred in not finding that Rapp Collins was fraudulently induced into entering into the Agreement with Mohr. As the basis for this argument, Rapp Collins challenges the following findings of fact and conclusions of law:

**Findings of Fact:**

DMDA was not in direct competition with Rapp Collins;

Mohr told several officers of Rapp Collins that his future plans included remaining in the industry by buying a direct marketing company, starting one, or joining another existing company;

Mohr told Crawford, CEO of Omnicom, that his future plans included remaining in the industry by buying a direct marketing

company, starting one, or joining another existing company.

## Conclusion of Law

Mohr had no affirmative duty during the negotiation of the consulting agreement to disclose his negotiations to purchase DMDA, his ultimate purchase of DMDA, and his appointment as DMDA's CEO.

Rapp Collins argues that because the findings of fact are not supported by the evidence, it was entitled to judgment on its affirmative defense that Mohr fraudulently induced Rapp Collins to enter into the Agreement.

Whether a finding was established as a "matter of law" or was "against the great weight and preponderance of the evidence" are the correct challenges by the party with the burden of proof to the legal and factual sufficiency of an adverse finding. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). In reviewing for legal sufficiency, a matter of law point requires a two-pronged inquiry. First, the reviewing court must examine the record for evidence supporting the finding of fact. Second, if no evidence supports the finding, the court must determine from the record whether the contrary position is established as a matter of law. *Hickey v. Couchman,* 797 S.W.2d 103, 109–10 (Tex. App.—Corpus Christi 1990, writ denied) (citing *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989)). In reviewing for factual sufficiency, we look to see if a finding is "against the great weight and preponderance of the evidence." The inquiry is whether the finding is so contrary to the overwhelming weight of all relevant evidence as to be clearly wrong and unjust. *Id.* (citing *Cain,* 709 S.W.2d at 176).

Rapp Collins had the burden to prove its affirmative defense of fraudulent inducement. The trial court found against it. We, therefore, first review the record to determine if any evidence supports the trial court's relevant findings. *See Hickey,* 797 S.W.2d at 109–10.

■ The Agreement provides, and the parties agree, that New York law controls the substantive issues in this lawsuit. In order to sustain a cause of action for fraudulent inducement under New York law, the plaintiff must show: (1) misrepresentation, concealment or nondisclosure of a material fact; (2) an intent to induce the other party to rely on it; (3) justifiable reliance by the aggrieved party; and (4) injury. *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.,* 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833, 835 (1958); *Shea v. Hambros PLC,* 673 N.Y.S.2d 369, 373 (N.Y.App.Div.1998).

■ Rapp Collins argues that Mohr failed to disclose the material fact that he was negotiating to purchase DMDA and become its CEO during the term of the Agreement. Rapp Collins contends it would not have entered into the Agreement had it known Mohr's plan with DMDA. However, we conclude the evidence does not support Rapp Collins's argument that Mohr failed to disclose a material fact. The record shows that after Mohr informed Wren he wanted to resign, he told Crawford, CEO of Omnicom, Pat Curley, CFO of Rapp Collins, Steve Judge, an executive vice president of Rapp Collins, Don Daniel, an executive vice president of Rapp Collins, and Edward McNally, chief operating officer and chief financial officer for Rapp Collins, that he was interviewing for employment, looking at several direct marketing companies in the Dallas area that he might buy, and that he would wind up in the direct marketing/advertising business. Judge and McNally testified that Mohr informed them he was looking at several business opportunities that were in the developmental stages.

Further, because the Agreement allowed Mohr to stay in the direct marketing/advertising business, there was no basis in the Agreement for Rapp Collins to believe Mohr would not remain in the business even during the term of the Agreement. We conclude this evidence supports the trial court's findings that Mohr disclosed to Crawford and others at Rapp Collins that he would remain in the business and that he would possibly purchase a direct marketing/advertising firm in Dallas. Thus, there is no evidence to support Rapp Collins's contention that Mohr intentionally misrepresented, concealed, or

failed to disclose a material fact to induce Rapp Collins to enter into the Agreement.

Likewise, we have reviewed the relevant evidence and determine the trial court's findings were not so contrary to the overwhelming weight of all the relevant evidence as to be clearly wrong and unjust. *See Cain,* 709 S.W.2d at 176. Even though Judge and McNally both testified that they thought Mohr's plans of possibly buying another company would happen after the term of the Agreement had expired, we conclude this evidence is not enough to render the trial court's findings clearly wrong and unjust.

The findings that Mohr disclosed his general plans to Rapp Collins support the trial court's conclusion that Mohr had no affirmative duty to specifically disclose his purchase of DMDA; rather, Mohr complied with any duty he had by informing Rapp Collins of his possible plans. Further, in light of the fact that the Agreement allowed Mohr to stay in the industry, we conclude the finding that DMDA was not in direct competition with Rapp Collins is irrelevant to our determination of the issue of fraudulent inducement.

Because there is no evidence that Mohr misrepresented, concealed, or failed to disclose a material fact, the trial court did not err in finding against Rapp Collins on its affirmative defense of fraudulent inducement.

### Breach of Contract

■ Rapp Collins next argues that the trial court erred in finding that Mohr did not breach the consulting agreement by purchasing DMDA and becoming its CEO. The basis of this argument is that Mohr's position at DMDA interfered with his duties as a consultant in violation of the Agreement. Rapp Collins argues that because Mohr became CEO of a competing company, it could not use him in the manner contemplated by the Agreement. Mohr responds that Rapp Collins could have but chose not to use his services in numerous ways and that his position at DMDA did not interfere with his ability to fulfill the terms of the Agreement.

The critical inquiry here is whether Mohr's position at DMDA interfered with his ability to act as consultant to Rapp Collins under the terms of the Agreement. Therefore, we look to see if any evidence supports the trial court's finding that Mohr's position as CEO of DMDA did not interfere with his duties as consultant under the Agreement.

Initially, we note that although Rapp Collins failed to attack the trial court's finding that Mohr's position as CEO of DMDA did not interfere with his duties under the Agreement, it does attack the trial court's similar conclusion of law and the substance of such finding. We will therefore review the evidence to support such finding as if Rapp Collins had challenged the legal and factual sufficiency of the finding.

One of the tasks under the bonus provision of the Agreement was the renegotiation of Rapp Collins's contract with Hyatt Hotels. The record contains some evidence that Mohr could have worked with Rapp Collins in renegotiating the Hyatt contract. Mohr testified that he had been closely involved with Hyatt for years; he knew the people there; he already knew their pricing structure, the services they were receiving from Rapp Collins, and what it would cost them to switch to another company. Further, he testified that the nonsolicitation clause incorporated into the Agreement would keep him from obtaining Hyatt as a client for DMDA and the nondisclosure clause would keep him from providing confidential information he already knew or would obtain about Hyatt. Mohr also testified that if Rapp Collins had not wanted him to be highly visible during the Hyatt negotiations, he would have been valuable for behind-the-scenes negotiations. Mohr's expert witness, James Trubby, testified that many direct marketing companies use outside consultants in negotiating contracts.

The record also contains evidence that Mohr was available to assist in other consulting tasks not associated with the Hyatt contract. Mohr testified that his knowledge of the company and his unique abilities qualified him to assist with tasks such as negotiating a new office lease, finding methods to reduce costs and increase revenues, and negotiating a new company health plan, among others. He testified that he repeatedly requested Rapp Collins to use his services in ways that

would benefit the company and allow him to earn his bonus. We conclude the evidence is legally sufficient to support the trial court's finding that Mohr's position as CEO of DMDA did not interfere with his ability to consult for Rapp Collins.

In reviewing the factual sufficiency of the evidence to support the finding that Mohr's position as CEO of DMDA did not interfere with his duties as consultant under the Agreement, we review all the relevant evidence. See Cain, 709 S.W.2d at 176. Wren, Judge, and McNally testified that officers of Rapp Collins determined it would be imprudent and foolish to send the president of a competitor to renegotiate an important contract with a client, and even Mohr admitted he would not use a competitor to negotiate an agreement for his company. However, the evidence shows that Rapp Collins allowed Mohr to compete with it in the same Agreement that contemplated using his services as a consultant.

Further, the trial court found, in unchallenged findings of fact, that Mohr could have benefitted Rapp Collins in numerous ways if requested and that Mohr could have acted behind the scenes without any client contact or any client of Rapp Collins being aware of his involvement. Because some evidence supports these unchallenged findings, they are binding on appeal. See McGalliard, 722 S.W.2d at 696–97 findings of fact filed and unchallenged are binding on the appellate court unless the contrary is established as a matter of law or if there is no evidence to support the finding. Even if the findings had been properly challenged, we conclude the evidence is factually as well as legally sufficient to support the findings. Mohr testified that because of his extensive knowledge of the company and his unique abilities, he could have helped Rapp Collins in numerous ways as a consultant, including assisting in behind-the-scenes negotiations with clients. Mohr's expert witness, James Trubby, testified that many direct marketing companies use outside consultants and that the use of such consultants can be beneficial to the company. No witness for Rapp Collins disputed that Mohr had the abilities to effectively consult for the company or that he had

been an outstanding asset to the company; rather, the executives of Rapp Collins contended he would no longer be effective because he had become the CEO of a competing company. We conclude the trial court's findings that Mohr could have benefitted Rapp Collins in numerous ways, including behind-the-scenes negotiations, are not so against the great weight and preponderance of the evidence so as to be clearly wrong and unjust. See Cain, 709 S.W.2d at 176.

Considering the fact that the Agreement allowed Mohr to compete while it retained him as a consultant, together with the fact that Mohr could have benefitted Rapp Collins in numerous ways, we conclude the finding that his position at DMDA did not interfere with his ability to consult for Rapp Collins is not so contrary to the overwhelming weight of all the relevant evidence as to be clearly wrong and unjust. See id. Further, this finding supports the trial court's conclusion of law that Mohr did not breach the Agreement by purchasing DMDA and becoming its CEO. The other findings Rapp Collins attacks under this argument are not relevant to the ultimate issue of whether Mohr breached the Agreement by purchasing DMDA and becoming its CEO. We conclude the trial court did not err in concluding Mohr did not breach the Agreement by purchasing DMDA and becoming its CEO.

### Good Faith and Fair Dealing

■ Rapp Collins next argues that the trial court erred in not finding that Mohr violated the covenant of good faith and fair dealing that is implied in the Agreement. Rapp Collins argues that it carried its burden on its affirmative defense that Mohr breached the implied covenant of good faith and fair dealing in the Agreement. Rapp Collins points out that under New York law, an implied covenant of good faith and fair dealing exists in every contract, and that, as part of this duty, a party to a contract may not voluntarily render himself incapable of performing under a contract. Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 188 N.E. 163 (1933); Van Valkenburgh, Nooger & Neville v. Hayden Pub. Co., 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142,

144, *cert. denied,* 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972).

The basis for Rapp Collins's argument is that Mohr put himself in a position, as CEO of DMDA, that rendered him unable to fulfill his consulting duties under the Agreement. We have already determined that there is evidence to support the trial court's findings that Mohr's position as CEO of DMDA did not interfere with his consulting duties under the Agreement and that Mohr could have benefitted Rapp Collins in numerous ways. Further, we have concluded the trial court did not err in concluding Mohr's position at DMDA did not interfere with his consulting duties. Therefore, there is evidence that Mohr could have performed under the Agreement, and we conclude the trial court did not err in failing to find that Mohr violated his duty of good faith by putting himself in a position where he could not complete his duties under the Agreement.

## Wren's Good Faith

■ Rapp Collins also argues that the trial court erred in finding that Wren's decision to deny Mohr the discretionary bonus was not fair, honest, reasonable, and in good faith. Rapp Collins does not dispute that Wren refused to pay Mohr the discretionary bonus under the contract. Rather, as an affirmative defense, Rapp Collins contends that Mohr failed to complete his consulting duties in a manner acceptable to Rapp Collins and therefore Wren's decision to deny the bonus was justified. Rapp Collins argues that under New York law, Wren's subjective determination was controlling.

Relating to this argument, in points of error one through seven, Rapp Collins challenges the following findings of facts and conclusions of law:

**Findings of Fact:**

that DMDA was not in direct competition with Rapp Collins;

that the essence of the consulting agreement was for Mohr to be available at least two days per month to render any required services to Rapp Collins;

that the essence of the consulting agreement was Mohr being available to consult on various unspecified issues and that negotiation of the Hyatt contract was only one of the many ways that Mohr could contribute;

that Wren's decision to deny Mohr the $150,000 discretionary bonus was not fair, honest, reasonable, and in good faith;

that Mohr would not have agreed to the consulting agreement if it meant that Wren could decide to withhold the bonus based upon Wren's dissatisfaction with Mohr engaging in other direct advertising activities.

**Conclusions of Law:**

that whether Wren's decision to deny Mohr the discretionary bonus was made in good faith is measured by an objective standard and Wren's subjective determination is not controlling;

that whether good faith is measured by an objective or subjective standard does not matter since Wren's determination was not in good faith under either standard.

The basis of Rapp Collins's attacks on these findings of fact and conclusions of law is that Wren's decision not to use Mohr as a consultant and consequently not to pay him the discretionary bonus was reasonable and in good faith in light of Mohr's purchase of DMDA and position as its CEO. Rapp Collins argues that because DMDA was in direct competition with Rapp Collins, it could not send Mohr, as CEO of a competitor, to negotiate deals on Rapp Collins's behalf. It argues that Wren's decision to stop Mohr from performing was therefore reasonable and in good faith.

Rapp Collins argues that the Agreement vested Wren with the discretion to determine whether Mohr's performance under the Agreement was satisfactory. According to Rapp Collins, New York law measures such discretion in a contract by a subjective, not objective, standard. Thus, in the absence of bad faith, if Wren subjectively believed Mohr did not perform satisfactorily under the Agreement, he could justifiably deny the bonus.

We agree with the trial court's conclusion of law that whether New York law imposes

an objective or subjective standard is not relevant in this case. The undisputed facts show that Mohr was never given the opportunity to perform. Thus, Wren put himself and Mohr in a position where he could not evaluate Mohr's performance and we cannot review his evaluation under either an objective or subjective standard.

Although Rapp Collins argues that Mohr made performance impossible by becoming CEO of DMDA, the essence of this argument is again that Mohr's position at DMDA interfered with his ability to act as consultant for Rapp Collins. We have already determined that the evidence supports the finding of fact that Mohr's position at DMDA did not interfere with his ability to perform consulting duties under the Agreement.

■ Under New York law, Rapp Collins was not entitled to withhold payment to Mohr based on Mohr's lack of performance when Rapp Collins, not Mohr, made it impossible for Mohr to perform. *See Wieder v. Skala*, 80 N.Y.2d 628, 593 N.Y.S.2d 752, 609 N.E.2d 105 (1992). "[I]n every contract there is an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part." *Grad v. Roberts*, 14 N.Y.2d 70, 248 N.Y.S.2d 633, 198 N.E.2d 26, 28 (1964); *see also Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.*, 135 A.D.2d 891, 522 N.Y.S.2d 292, 293 (N.Y.App.Div.1987) ("A party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition."). In this case, because the evidence supports the trial court's finding that Mohr's position as CEO of DMDA did not interfere with his ability to act as a consultant for Rapp Collins and that he could have benefitted Rapp Collins if requested, there was no justification for Wren to deny him the opportunity to perform under the contract. Further, the trial court also concluded, as neither the evidence nor the parties dispute, that Mohr did nothing to breach his obligations of non-solicitation and non-disclosure; nothing in the Agreement prevented him from purchasing DMDA and becoming its CEO.

We conclude the other findings Rapp Collins attacks under this argument are irrelevant to the judgment; specifically, it is irrelevant whether DMDA was in direct competition with Rapp Collins or whether the essence of the agreement was to renegotiate the Hyatt contract or to be available several days a month for consultation. It is also irrelevant whether Mohr would have signed the Agreement had he known that Wren would deny the bonus based on his purchase of DMDA. The evidence supports the critical findings and conclusion that Mohr's position at DMDA did not interfere with his ability to act as consultant for Rapp Collins and that he could have benefitted Rapp Collins in numerous ways had he been given the opportunity to perform. Thus, the evidence does not support Rapp Collins's affirmative defense that Mohr failed to complete his consulting duties in a manner acceptable to Rapp Collins. The trial court properly concluded that Wren's decision to deny the bonus was not fair, honest, reasonable, and in good faith.

**Executive Salary Continuation Plan**

Finally, Rapp Collins argues the trial court erred in finding that Mohr gave up rights under the Executive Salary Continuation Plan or was motivated by the $150,000 discretionary bonus to execute the Agreement. Rapp Collins attacks several of the trial court's findings relating to this argument. However, as Mohr points out, it is unclear why Rapp Collins attacks these findings because, as Rapp Collins admits, the findings are "wholly irrelevant to any interpretation of the terms of the August 31, 1992 Consulting Agreement." Because the findings are irrelevant to the trial court's judgment and could not be dispositive of this appeal, we need not address Rapp Collins's argument as to the Executive Salary Continuation Plan.

**Conclusion**

We conclude the evidence is legally and factually sufficient to support the challenged findings of fact relevant to the judgment, and that the trial court did not err in entering the critical conclusions of law that also support

the judgment. Therefore, we overrule Rapp Collins's points of error one through seventeen and affirm the trial court's judgment awarding Mohr $150,000 under the Agreement.

### Attorney's Fees

■ In a single cross-point, Mohr complains the trial court erred in failing to award his attorney's fees. The parties agree that under New York law, Mohr would not be entitled to attorney's fees in this case, but that Texas law would allow the award of attorney's fees. *See, e.g., Cross v. Zyburo,* 185 A.D.2d 967, 587 N.Y.S.2d 670, 672 (N.Y.App.Div.1992) (citing *Hooper Assoc. v. AGS Computers,* 74 N.Y.2d 487, 549 N.Y.S.2d 365, 548 N.E.2d 903, 904 (N.Y. 1989)) (under New York law, fees are not recoverable in a claim for breach of contract or fraud except where expressly agreed to by contract or provided by statute); *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 39.001 (Vernon 1997) (permitting recovery of reasonable attorney's fees for claim based on oral or written contract). The parties also agree that questions of substantive law are controlled by the laws of the state where the cause of action arose, but that remedial and procedural matters are governed by the law of the state where the action is maintained. *See Calif. v. Copus,* 158 Tex. 196, 309 S.W.2d 227, 230, *cert. denied,* 356 U.S. 967, 78 S.Ct. 1006, 2 L.Ed.2d 1074 (1958) The parties disagree on whether an award of attorney's fees is a substantive or remedial right, and therefore, which law applies.

Mohr argues that an attorney's fee award is a remedial matter governed by Texas law. Rapp Collins contends an award of attorney's fees is substantive under Texas law, and that New York law would apply. We agree with Rapp Collins.

Relying on *Missouri State Insurance Co. v. Jones,* 290 U.S. 199, 54 S.Ct. 133, 78 L.Ed. 267 (1933), where the United States Supreme Court determined that attorney's fees should be considered part of the amount in controversy for purposes of federal diversity jurisdiction, the Fifth Circuit Court of Appeals stated that the "award of attorney's fees is a part of the substantive right of a suit." *Ku-*

*cel v. Walter E. Heller & Co.,* 813 F.2d 67, 73 (5th Cir.1987); *see also Exxon Corp. v. Burglin,* 4 F.3d 1294, 1302 (5th Cir.1993) (following *Kucel* ). As one court has stated, "[s]tatutes providing for attorneys' fees impose a liability which one may enforce as a matter of right. Such fees are put in controversy in the suit and are a part of the substantive right." *Prudential Ins. Co. of Am. v. Carlson,* 126 F.2d 607, 611 (10th Cir.1942) (citing *Jones,* 290 U.S. at 202, 54 S.Ct. 133); *see also Corrosion Rectifying Co. v. Freeport Sulphur Co.,* 197 F.Supp. 291, 292 (S.D.Tex. 1961) (recognizing that Texas authorities and other cases hold that the issue of attorney's fees is substantive and governed by the law of the state where the substantive rights accrued); *Prairie Producing Co. v. Angelina Hardwood Lumber Co.,* 882 S.W.2d 640, 652–53 (Tex.App.—Beaumont) (applying Louisiana law to the issue of attorney's fees in a case where Louisiana law governs substantive rights of lawsuit), *modified on reh'g on other grounds,* 885 S.W.2d 640 (Tex.App.—Beaumont 1994, writ denied); *Bergstrom Air Force Base Fed. Credit Union v. Mellon Mortgage, Inc.–East,* 674 S.W.2d 845, 850 (Tex.App.—Tyler 1984, writ ref'd n.r.e.) (recognizing that the award of attorney's fees is a matter of substantive law). We agree with these authorities that the issue of attorney's fees is a substantive part of a lawsuit.

Mohr cites *Grace v. Allen,* 407 S.W.2d 321 (Tex.Civ.App.—Dallas 1966, writ ref'd n.r.e.), as the only similar Texas case holding that the attorney's fee issue in a claim arising under New York law was governed by Texas law. This Court in *Grace* concluded that, although New York law applied to the substantive issue of whether the defendant's actions constituted the unauthorized practice of law, Texas law applied to whether the parties could recover attorney's fees. *Id.* at 325. However, in concluding Texas law applied to the issue of attorney's fees, the Court incorrectly focused on whether the Texas statute allowing recovery of attorney's fees on a claim based on "personal services" included a claim for services rendered in another state, instead of determining whether the issue of attorney's fees is a substantive right, or whether it is remedial or procedural. Be-

cause the *Grace* Court did not reach the issue of whether a claim for attorney's fees is substantive, procedural, or remedial, we conclude *Grace* is inapplicable.

We conclude the issue of attorney's fees is a substantive part of a lawsuit and therefore should be governed by the law of the state governing the substantive issues. In this case, New York law applies to the substantive issues. Therefore, we conclude that the trial court did not err in determining that under New York law, Mohr is not entitled to recover attorney's fees. We overrule Mohr's sole cross-point. We affirm the trial court's judgment.